**UNITED STATES of America**

v.

**Thomas W. PURCELL, Constance M. Purcell, John R. Gingras, David Stevenson, Main Line Federal Savings and Loan Association, Commonwealth of Pennsylvania State Employees Retirement System.**

**Civ. A. No. 89–3642.**

United States District Court,
E.D. Pennsylvania.

Sept. 30, 1991.

As Amended Oct. 2, 1991.

---

David M. Katinsky, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

William J. Hagan, Ambler, Pa., Steven J. Proctor, Pottstown, Pa., Keith R. Dutill, Eric Bland, Donald M. Donaldson, Philadelphia, Pa., for defendants.

## MEMORANDUM

O'NEILL, District Judge.

### I. *Introduction*

This is a non-jury action brought by the United States to reduce to judgment certain federal tax assessments made against defendant Thomas W. Purcell for the tax years 1980–1986. The government seeks to set aside as fraudulent the conveyance of real property located at 211 Cricket Avenue, Ardmore, Pennsylvania from defendant Thomas Purcell to himself and defendant Constance Purcell as tenants in the entireties. The government seeks to foreclose existing federal tax liens on the Cricket Avenue property. The government also seeks to foreclose federal tax liens on real property located at 328 Locust Avenue, Ardmore, Pennsylvania.

I held a non-jury trial and the parties have submitted their proposed findings of fact and conclusions of law and supporting memoranda. This Memorandum constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. Rule 52(a).

For the reasons that follow, I conclude that the transfer of property from Mr. Purcell to himself and Mrs. Constance Purcell was fraudulent, either by intent or by law. Therefore, I will enter judgment in favor of the United States and against defendants Thomas and Constance Purcell. I conclude that if the federal tax lien attached to the Locust Avenue property the IRS does not qualify for the protection of the Pennsylvania recording statutes because it had notice of the transfer of Mr. Purcell's interest in the Locust Avenue property to defendant Gingras. I therefore will enter judgment in favor of defendant Gingras and against the United States. I also will enter judgment in favor of the remaining defendants.

### II. *Findings of Fact*

1. By his own description, Mr. Purcell is a "tax protester" and has for a number of years been a member of the Committee for Constitutional Taxation.

2. Mr. Purcell filed individual federal income tax returns for 1980 and 1981 in which he objected to listing any items of income or deductions and claimed the Fifth Amendment privilege.

3. On March 12, 1984, Mr. Purcell was notified of deficiencies for the 1980 and 1981 tax years and advised that a tax deficiency would be assessed against him unless he petitioned the Tax Court within 90 days. The deficiencies listed were:

| Tax Year Ended | Tax | Additions to Tax Under 26 U.S.C. | | |
| --- | --- | --- | --- | --- |
| | | § 6651(a) | § 6653(a)(1) | § 6653(a)(2) |
| 12/31/80 | $12,886 | $3,322 | $644 | — |
| 12/31/81 | 11,483 | 2,871 | 574 | 50% of interest due on $11,483 |

The Notice of Deficiency also informed Mr. Purcell that there were deficiencies due to penalties under 26 U.S.C. § 6654 in the amounts of $822 for 1980 and $880 for 1981.

4. On April 18, 1985, the United States Tax Court entered an Order and Decision in the case of *Thomas W. Purcell v. Commissioner of Internal Revenue*, Dkt. No. 17466-84. The Tax Court ordered and decided that the taxpayer owed all deficiencies listed in the Notice of Deficiency.

5. On September 9, 1985, the Internal Revenue Service made assessments and notices of demand and payment against Mr. Purcell for the 1980 and 1981 tax years. The IRS assessments were for the amounts in the Tax Court Order and Decision, except that the IRS added a negligence penalty pursuant to 26 U.S.C. § 6653(a)(2) as permitted by the Tax Court.

6. Mr. Purcell's unpaid assessed balance for the 1980 tax year is $27,529.07.

His unpaid assessed balance for the 1981 tax year is $25,523.62.

7. Mr. Purcell does not dispute the accuracy of any of the figures he reported on his tax returns for the tax years 1982, 1983, 1984, 1985 or 1986.

8. Mr. Purcell filed a delinquent tax return which showed a deficiency for the 1982 tax year. On October 21, 1985, the IRS made an assessment and notice of demand and payment against Mr. Purcell in the following amounts: (1) $3620 in tax deficiency; (2) $353.07 in estimated tax penalty; (3) $905 in delinquency penalty; (4) $470.60 in failure to pay tax penalty and (5) $1383.28 in interest. On February 10, 1986, the IRS made an additional assessment and issued a notice and demand for the 1982 tax year in the following amounts: (1) $208 in negligence penalty; (2) $133.50 in delinquency penalty; (3) $534 in audit deficiency; (4) $409.30 in interest and (5) $54.30 in failure to pay tax penalty.

9. Mr. Purcell's unpaid assessed balance for the 1982 tax year is $8,071.05.

10. Mr. Purcell filed a delinquent tax return which showed a deficiency for the 1983 tax year. On August 12, 1985, the IRS made an assessment and issued a notice and demand for payment against Mr. Purcell in the following amounts: (1) $3125 in tax deficiency; (2) $781.25 in delinquency penalty; (3) $171.87 in failure to pay tax penalty and (4) $621.35 in interest. On August 18, 1987, the IRS made an additional assessment and issued a notice and demand for the 1983 tax year in the following amounts: (1) $376 in audit deficiency; (2) $94 in delinquency penalty; (3) $203.52 in negligence penalty; (4) $193.05 in interest.

11. Mr. Purcell's unpaid assessed balance for the 1983 tax year is $5,566.04.

12. On March 17, 1986, the IRS made an assessment and issued a notice and demand for payment against Mr. Purcell for the 1984 tax year. Mr. Purcell's unpaid assessed balance for the 1984 tax year is $3,584.05. The assessed balance results from the tax deficiency reported by Mr. Purcell on his filed tax return.

13. On August 10, 1987, the IRS made an assessment and issued a notice and demand for payment against Mr. Purcell for the 1985 tax year. Mr. Purcell's unpaid assessed balance for the 1985 tax year is $5,650.42. Except for an IRS imposed charge of $28 for fees and costs, the assessed balance results from the tax deficiency reported by Mr. Purcell on his filed tax return.

14. On August 24, 1987, the IRS made an assessment and issued a notice and demand for payment against Mr. Purcell for the 1986 tax year. Mr. Purcell's unpaid assessed balance for the 1986 tax year is $6,833.01. The assessed balance results from the tax deficiency reported by Mr. Purcell on his filed tax return.

15. There was no credible testimony challenging the amounts of the assessments against Mr. Purcell.

16. The assessed balance does not include interest and penalties which accumulate pursuant to law after the date of assessment. The overall balance of taxes, penalties and interest owed by Mr. Purcell through November 5, 1990 is $141,698.59.

17. On August 26, 1986, the government recorded a Notice of Federal Tax Lien against Mr. Purcell with the Prothonotary of Montgomery County, Pennsylvania. The Notice was for $64,666.29 and concerned the tax years 1980, 1981, 1982 and 1984.

18. On April 30, 1987, the government recorded a Notice of Federal Tax Lien against Mr. Purcell with the Prothonotary of Montgomery County, Pennsylvania. This Notice was for $69,393.76 and concerned the tax years 1980, 1981, 1982, 1983 and 1984.

19. On December 8, 1988, the government recorded a Notice of Federal Tax Lien against Mr. Purcell with the Prothonotary of Montgomery County in the amount of $11,141.42 and concerning the tax years 1985 and 1986.

20. On or about May 8, 1975, Mr. Purcell and Ellen C. Purcell, his then current and now former wife, acquired certain real property located at 211 Cricket Avenue,

Ardmore, Montgomery County, Pennsylvania.

21. A purchase money mortgage dated May 8, 1975 and recorded May 9, 1975 was granted on the property in favor of Fidelity Bond and Mortgage Company in the amount of $25,000. On or about August 11, 1985, Fidelity Bond and Mortgage Company assigned the mortgage on the Cricket Avenue property to the Commonwealth of Pennsylvania State Employee Retirement Fund. The assignment was recorded on September 15, 1985.

22. By indenture dated July 30, 1979 and recorded August 30, 1979 with the Prothonotary of Montgomery County, Mr. Purcell and Ellen C. Purcell transferred the Cricket Avenue property to Mr. Purcell exclusively.

23. By indenture dated April 19, 1984 and recorded April 25, 1984 with the Office for Recording of Deeds of Montgomery County, Mr. Purcell transferred the Cricket Avenue property from himself to himself and defendant Mrs. Constance Purcell.

24. At the time of the 1984 conveyance of the Cricket Avenue property, Mr. Purcell was indebted to the United States for more than $40,000. This amount includes: (1) the amount owing for the 1980 and 1981 tax years, which at the time of the statutory notice of deficiency was $32,808.00, not including the penalty to be calculated under 26 U.S.C. § 6653(a)(2); (2) the amount owing the 1982 and 1983 tax years, which was $7,655 in tax alone, without interest or penalties.

25. At the time of the 1984 conveyance of the Cricket Avenue property, Mr. Purcell owned two lots worth between $17,000 and $20,000 in Accomack County, Virginia.

26. At the time of the 1984 conveyance of the Cricket Avenue property, Mr. Purcell owned a painting business. The business had approximately $5,000 to $6,000 in accounts receivable and approximately $1000 in accounts payable at the time of the marriage.

27. Mr. and Mrs. Purcell did not establish that at the time of the 1984 conveyance, the value of Mr. Purcell's assets was more than the amount required to pay his existing debts, including his tax liability to the United States.

28. In 1979, Mr. Purcell bought out Ellen C. Purcell's one half interest in the Cricket Avenue property for $16,000.

29. In 1989, Mr. and Mrs. Purcell listed the Cricket Avenue property for sale for $149,000 and received an offer of $134,900.

30. At the time of the 1984 conveyance, therefore, the Cricket Avenue property was worth between $32,000 and $134,900.

31. Mr. Purcell received nothing of monetary value, except one dollar, in return for his conveyance of the Cricket Avenue property to Mrs. Purcell and himself.

32. Mr. and Mrs. Purcell failed to establish by clear and convincing evidence that Mrs. Purcell gave fair consideration for the conveyance of the Cricket Avenue property.

33. Prior to executing the indenture to himself and Mrs. Purcell, Mr. Purcell had received notice of the deficiency for the 1980 and 1981 tax years.

34. At the time of the 1984 conveyance, Mr. Purcell was aware that he was indebted to the government for the 1982 and 1983 tax years.

35. The Court does not find Mr. Purcell's testimony that he believed the IRS would not pursue him for the taxes owed to be credible.

36. Prior to her marriage, Mrs. Purcell knew Mr. Purcell was a tax protester and that he did not pay taxes.

37. Although Mr. Purcell explained his beliefs about the constitutionality of the income tax system to Mrs. Purcell, she continued to file her own tax returns and to pay taxes. Mrs. Purcell never claimed the Fifth Amendment privilege on her tax returns, as her husband did. Mrs. Purcell files individual tax returns rather than file jointly with her husband.

38. Mr. and Mrs. Purcell married on February 25, 1984.

39. Both Mr. and Mrs. Purcell testified that they entered into a Contract to Marry on February 20, 1984. Under the terms of

the Contract to Marry, Mr. Purcell promised to convey the Cricket Avenue property to Mrs. Purcell in consideration of her promise to marry him. Mr. Purcell testified that he believed that this document transferred the property.

40. The Contract to Marry was not drafted by an attorney but by Mr. Purcell without the assistance of an attorney.

41. The Contract to Marry was never recorded.

42. The Contract to Marry is not referred to in the deed conveying the property to Mr. and Mrs. Purcell which was recorded in the Montgomery County land records.

43. Mr. and Mrs. Purcell were the only witnesses who testified that the Contract to Marry existed prior to Mr. Purcell's receipt of the statutory notice of deficiency for the 1980 and 1981 years. There was no evidence independent of the testimony of defendants Purcell that the Contract to Marry was executed on the date alleged, February 20, 1984.

44. Mr. Purcell and Mrs. Purcell each testified that Mr. Purcell pursued dangerous hobbies, such as flying, scuba diving and parachuting, for which he was not able to obtain life insurance. Each testified that Mrs. Purcell was motivated to request the Contract to Marry in part by Mr. Purcell's hobbies.

45. At their depositions, neither of the Purcells mentioned Mr. Purcell's hobbies as a motive for Mrs. Purcell's request for the Contract to Marry.

46. As Mr. and Mrs. Purcell dated for four and one-half years prior to marriage, the Court does not credit Mrs. Purcell's testimony that the Purcells did not ask an attorney to draft the Contract to Marry because there was not sufficient time before the marriage was to take place.

47. The Court finds that Mrs. Purcell would not have relied on Mr. Purcell to draft a document of such importance and does not credit her testimony that she did. Mrs. Purcell demonstrated her lack of faith in Mr. Purcell's legal skill by her continued filing of tax returns and payment of taxes after Mr. Purcell's explanation to her of why the United States Constitution does not require payment of taxes.

48. For the reasons above, the Court finds that the Contract to Marry was not executed prior to the receipt of the Notice of Deficiency for the 1980 and 1981 tax years.

49. For the reasons above, the Court finds that the Contract to Marry was not executed prior to the marriage.

50. The Court finds the conveyance left Mr. Purcell insolvent in that the present salable value of his assets was less than the amount required to pay existing debts as they matured.

51. The Court finds that Mrs. Purcell did not pay fair consideration for the conveyance.

52. The Court finds that, whether or not with intent to defraud, the conveyance was fraudulent against the United States as a creditor of Mr. Purcell.

53. The Court finds that the Contract to Marry was entered into with the actual intent to hinder, delay or defraud the United States as a creditor of Mr. Purcell.

54. The Court finds the following facts support an inference of intentional fraud in this case: (1) Mrs. Purcell was generally familiar with Mr. Purcell's tax problems; (2) the 1984 conveyance lacked fair consideration; (3) the transferor and the transferee are closely related; (4) tax litigation against Mr. Purcell for the 1980 and 1981 tax years was pending at the time of the transfer; (5) Mr. Purcell reserved a benefit in the Cricket Avenue property; (6) Mr. Purcell retained possession of the Cricket Avenue property.

55. The Court finds that, in conveying the property from Mr. Purcell to Mr. and Mrs. Purcell, the Purcells had actual intent to defraud Mr. Purcell's creditors.

56. By indenture dated November 1, 1979 and recorded on November 7, 1979, John M. Kenney, Administrator of the Estate of John J. Kenney, conveyed the real property located at 328 Locust Avenue, Ardmore, Pennsylvania to Mr. Purcell,

David M. Stevenson and John R. Gingras, trading as G.S.P. Associates, a fictitious name.

57. A mortgage dated November 1, 1979 and recorded on November 7, 1979 was granted on the Locust Avenue property in favor of Main Line Federal Savings and Loan Association in the amount of $40,000.

58. In early 1982 or 1983, Richard Boandl, a revenue agent of the Internal Revenue Service investigating the partnership's affairs, spoke with Gingras. Gingras testified that the agent was particularly interested in Mr. Purcell. Gingras testified that he provided agent Boandl with partnership returns for the two preceding years and with a current and preceding tax return of his own.

59. By indenture dated July 1, 1983, Mr. Purcell and Stevenson conveyed the Locust Avenue property to Gingras. This indenture was part of an Agreement of Sale dated July 1, 1983 and entered into by Mr. Purcell, Stevenson and Gingras by which Gingras was to buy out "all right, title and interest" of his partners in G.S.P. Associates and "all real property" owned by the partnership. The Agreement of Sale names the Locust Avenue property specifically as property held and managed by the partnership which is to be conveyed to Gringas alone. The indenture was executed and delivered in October 1983, when Gingras paid Purcell and Stevenson. Gingras paid Purcell $8498.00 by check.

60. Gingras did not attempt to record the indenture on the Locust Avenue property until August 1, 1989, almost five years after the indenture was delivered. He did not record the deed until May 7, 1990.

61. On October 15, 1983, Gingras filed the final partnership return for G.S.P. Associates. The return, marked as final, reported that the partnership was terminated by June 30, 1983 and identified 328 Locust Avenue as a property owned by the partnership.

62. On April 13, 1984, Stevenson filed an individual federal income tax return on behalf of his wife and himself in which he reported the sale of his partnership interest as a long-term capital gain. Stevenson's 1983 return was audited by the IRS which issued a "Statement of Change" to his account on January 6, 1986 approving the return as filed.

63. On April 16, 1984, Gingras filed an individual federal income tax return on behalf of his wife and himself in which he claimed the entire depreciation on the Locust Avenue property from July 1, 1983, the date from which Gingras was sole owner of the property.

64. From 1983 on, Gingras filed personal income tax returns reflecting his sole ownership of the Locust Avenue property.

65. In early 1985, prior to the filing of the first tax lien against Purcell in August 1986, IRS agent Kevin Whiting told Gingras over the telephone that he was investigating the transfer of the partnership interest by Purcell. In a follow-up letter, Agent Whiting requested documentation of the sale.

66. Gingras testified that he believed but was not certain that he had sent a copy of the deed to the Locust Avenue property to agent Whiting because he did not keep a list of documents he provided. Agent Whiting testified that he did not ask for or receive a copy of the indenture from Gingras.

67. At least as of March 19, 1985, IRS agent Whiting possessed a copy of the Agreement of Sale, dated July 1, 1983, by which Gingras agreed to purchase the interests of Purcell and Stevenson in the Locust Avenue property.

68. Before the first tax lien arose or was filed against Mr. Purcell, Agent Whiting possessed copies of the Agreement of Sale for the Locust Avenue property, correspondence, accountant's worksheets and cancelled checks showing the purchase price paid by Gingras and the 1983 income tax returns for both Gingras and the partnership reflecting the termination of the partnership and Gingras' acquisition of the Locust Avenue property.

69. Agent Whiting had actual knowledge in 1985, before the first federal tax

lien arose or was filed against Mr. Purcell, that Gingras had purchased Stevenson's and Purcell's interests in the Locust Avenue property.

70. As a result of his 1985 investigation, Agent Whiting prepared and filed on July 15, 1985 an "Income Tax Examination Changes" form in which he calculated Mr. Purcell's gain on the sale of his interest in the partnership and the Locust Avenue property and the additional tax to be assessed against Purcell. Agent Whiting testified that the IRS knew that Purcell had sold his interest in the Locust Avenue property and that he owed a tax on it.

71. In March 1989, IRS Agent Antonio Cruz met with Gingras to determine the correct owner of the Locust Avenue property. He requested and received from Gingras a copy of the indenture on the Locust Avenue property and informed Gingras of the IRS lien on the property.

72. The IRS attached a copy of the unrecorded deed to the Complaint in this action, which was filed May 12, 1989.

### III. *Conclusions of Law*

This Court has jurisdiction over both the subject-matter of and the parties to this action.

The government contends that taxpayer Thomas Purcell owes it assessed and unpaid taxes for the tax years 1980–86. Defendants Mr. and Mrs. Purcell contend that the government may not foreclose existing federal tax liens on the property known as 221 Cricket Avenue because, pursuant to a Contract to Marry and a recorded deed, Mrs. Purcell owns the property with Mr. Purcell as tenants in the entireties. Defendant Gringas contends that the government may not foreclose existing federal tax liens on real property located at 328 Locust Avenue because the government liens are not valid against Gingras, who purchased Purcell's interest in the property. I will address the contentions of defendants Mr. and Mrs. Purcell first.

### A. Defendants Thomas W. Purcell and Constance M. Purcell

■ Tax assessments by the government are presumptively correct. *Sullivan*

*v. United States,* 618 F.2d 1001, 1008 (3d Cir.1980); *United States v. Vespe,* 868 F.2d 1328, 1331 (3d Cir.1989). In this case, the government established its *prima facie* case by offering into evidence the Form 4340 Certificate of Assessments and Payments for the tax years 1980–1986. *Psaty v. United States,* 442 F.2d 1154, 1159 (3d Cir.1971); *United States v. Nuttall,* 713 F.Supp. 132, 135 (D.Del.1989), *aff'd. mem.,* 893 F.2d 1332 (3d Cir.1989). The taxpayer bears the burden of proving by a preponderance of the evidence that a particular assessment is erroneous. *Sullivan,* 618 F.2d at 1008.

■ The government introduced evidence that the assessments for 1984, 1985 and 1986 were based wholly on the amount of tax reported due on Mr. Purcell's returns and that most of the assessments for 1982 and 1983 were based on the taxpayer's returns. Mr. Purcell did not dispute the accuracy of any of the figures on his 1982–1986 returns and did not present evidence questioning the accuracy of the additional assessments for 1982 and 1983. In addition, the Decision and Order entered in *Thomas W. Purcell v. Commissioner,* Dkt. No. 17466–84 (April 18, 1985) is *res judicata* as to the deficiencies for the years covered in the decision, the 1980 and 1981 tax years. *United States v. Int'l. Bldg. Co.,* 345 U.S. 502, 506, 73 S.Ct. 807, 809, 97 L.Ed. 1182 (1953); *Commissioner v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).

I conclude that the assessments made against taxpayer Thomas W. Purcell for the tax years 1980–1986 are valid. Taxpayer Thomas Purcell is indebted to the United States of America in the amount of $141,-698.59, plus statutory additions accruing between November 5, 1990 and today, for the 1980–1986 tax years.

■ Defendants Mr. and Mrs. Purcell contend that the Cricket Avenue property is not subject to the government lien because by indenture dated April 19, 1984 and recorded April 25, 1984, and entered into pursuant to a Contract to Marry, the

Cricket Avenue property was transferred from Mr. Purcell alone to both Mr. and Mrs. Purcell as tenants in the entireties. Whether or not the indenture was made with intent to defraud, the conveyance is set aside as fraudulent.

### 1. Fraud Without Regard to Intent

The parties do not dispute that rights in property are determined by Pennsylvania law. 39 Pa.Stat.Ann. § 354 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made, or the obligation is incurred without fair consideration.

39 Pa.Stat.Ann. § 352. The Statute defines the term insolvent:

> A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

When the conveyor is in debt at the time of the conveyance, "the burden rests upon the grantee to establish by clear and convincing evidence that either the conveyor was solvent and was by such conveyance not rendered insolvent; or that a fair consideration had been paid for the conveyance." *United States v. St. Mary*, 334 F.Supp. 799, 804 (E.D.Pa.1971). The burden is heavier on the wife of the debtor when she is the grantee: "the *burden is on the wife to show by clear and satisfactory evidence, beyond that required of other creditors*, that at the time of the transfer he [the conveyor] was solvent or that she paid full consideration." *Winter v. Welker*, 174 F.Supp. 836, 843 (E.D.Pa.1959) (emphasis added); *see also In re Elliott*, 83 F.Supp.

771, 773 (E.D.Pa.1948), *aff'd*, 173 F.2d 895 (3d Cir.1949). The Purcells failed to carry this burden.

The United States is deemed a creditor "from the date when the obligation to pay income taxes accrues," *United States v. St. Mary*, 334 F.Supp. at 803, that is, April 15 of the year following the tax year. *See also United States v. Klayman*, 736 F.Supp. 647, 649 (E.D.Pa.1990). Therefore, on the date of the indenture conveying the Cricket Avenue property, April 19, 1984, the taxpayer owed the government at least $40,000 for the tax years 1980–1983.[1] Since the taxpayer was indebted at the time of the conveyance, the burden was on the Purcells, as the grantees, to show by clear and convincing evidence either (1) that at the time of the conveyance taxpayer was solvent or (2) that Mrs. Purcell paid fair consideration. They did neither.

The Purcell defendants did not show that Mr. Purcell was solvent at the time of the conveyance. There was testimony at trial that the taxpayer had two assets at that time, land in Virginia and a painting company in Pennsylvania. The land in Virginia was worth between $17,000 and $20,000.[2] Mr. Purcell testified that at the time of his marriage his painting company had $5,000 to $6,000 in accounts receivable and $1,000 in accounts payable. The Purcells did not introduce any evidence as to the taxpayer's liabilities but the evidence showed that his debt to the IRS alone was in excess of $40,000. The Purcells therefore did not carry their burden of showing that the value of Mr. Purcell's assets was more than the amount required to pay his then existing debts. *See* 39 Pa.Stat.Ann. § 352(1).

Nor did Mrs. Purcell show by "clear and satisfactory evidence" that she paid fair consideration for the property. *Winter v.*

---

1. At a minimum, as of April 19, 1984, the taxpayer was indebted to the United States for the $32,808 listed on the Notice of Deficiency for the 1980 and 1981 tax years, not including the penalty that was to be calculated under 26 U.S.C. § 6653(a)(2), and for $7655 for the 1982 and 1983 tax years, not including penalties and interest.

2. At trial, Mr. Purcell estimated the value of his land in Virginia at $17,000. After trial, the Purcells submitted a letter from the County of Accomack Department of Assessment in which the County estimated that the land value was $20,000 at the time of the transfer of the Cricket Avenue property.

*Welker,* 174 F.Supp. at 843. The Pennsylvania statute defines fair consideration:

Fair consideration is given for property or obligation:

(a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied; or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

39 Pa.Stat.Ann. § 353.

Testimony at trial established that, at the time of the conveyance in 1984, the Cricket Avenue property was worth between $32,000 and $134,900.[3] On the face of the indenture, the consideration offered by Mrs. Purcell for the property was "one dollar and other valuable and lawful consideration."

■ The Pennsylvania Supreme Court has construed the statute to mean that, under certain circumstances, a conveyance for nominal consideration is presumptively fraudulent. "[W]here a husband conveys realty to his wife or to his wife and himself as tenants by the entireties for a nominal or inadequate consideration, at a time when the husband is insolvent or thereby rendered insolvent, the conveyance is presumptively fraudulent as to the husband's creditors." *First National Bank v. Hoffines,* 429 Pa. 109, 115, 239 A.2d 458 (1968) (and citations therein). As the indenture is dated after the date of the Purcells' marriage, the consideration on the face of the indenture is nominal and Mr. Purcell was insolvent at the time, the conveyance is deemed presumptively fraudulent as to the government as a creditor.

The Purcells contended at trial that the consideration received by the taxpayer for the land was Mrs. Purcell's promise to marry him. This promise is not referred to on the face of the indenture which was execut-

ed and recorded after the marriage, but in a Contract to Marry purportedly entered into several days prior to the marriage, which took place February 25, 1984.

■ While marriage may be good consideration, *see Magniac v. Thomson,* 32 U.S. (7 Pet.) 348, 8 L.Ed. 709 (1833), marriage may only be consideration for the land exchange if the Contract to Marry was entered into prior to the Purcell's marriage. The only evidence that the Contract was entered into on February 21, 1984 was the Purcells' testimony. The Purcells did not introduce any other evidence to support their contention that the Contract was entered into before they were married. The Contract was never recorded and is not referred to in the deed which was recorded in April 1984. The Contract was drafted by Mr. Purcell and was not witnessed by any non-parties. The Purcells' contention that they entered into the Contract to Marry prior to marriage is not credible. Marriage, therefore, did not supply consideration for the conveyance.

The Purcells did not establish "by clear and convincing evidence that the conveyor was solvent or was not rendered insolvent by the conveyance or that fair consideration had been paid for the conveyance. *St. Mary,* 334 F.Supp. at 804. Without regard to their actual intent, therefore, the conveyance of the Cricket Avenue property to the Purcells together will be set aside as fraudulent as to the government as creditor. 39 Pa.Stat.Ann. § 354.

### 2. *Intent to Defraud*

■ Alternatively, I conclude that the Purcells intended to defraud Mr. Purcell's creditors by conveying the Cricket Avenue property to Mr. and Mrs. Purcell.

39 Pa.Stat.Ann. Section 357 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

---

**3.** Mr. Purcell testified that he bought out his first wife's half interest in the property in 1979 for $16,000 and that the Purcells received an

offer for the property in 1989 of $134,900, after listing it on the market for $149,000.

The Pennsylvania Supreme Court has construed the statute to mean "a conveyance from husband to wife for nominal consideration is presumed fraudulent on its face as to creditors, and no further evidence of actual fraud is required." *United States v. Klayman*, 736 F.Supp. 647, 649 (E.D.Pa.1990) (citations omitted). "[W]hen a transfer from husband to wife for apparently nominal consideration has been alleged, the burden is on the wife to show by clear and satisfactory evidence that the conveyance was fair." *Id.*

As noted above, the consideration provided by Mrs. Purcell on the face of the indenture was apparently nominal: "one dollar and other good and valuable consideration." I have concluded that the Purcells have not met their burden of demonstrating by clear and satisfactory evidence that fair consideration was paid for the conveyance.

The Purcells contended at trial that this was not a conveyance between husband and wife but a transaction between two people intending to be married and that the consideration received by the taxpayer for the property was the future Mrs. Purcell's promise to marry him. This promise does not appear on the face of the indenture, which was executed and recorded after the marriage, but in the Contract to Marry, purportedly entered into several days prior to the marriage.

██ Actual intent to defraud creditors can be inferred from all the circumstances surrounding the transaction, including conduct subsequent to the conveyance. *Klayman*, 736 F.Supp. at 649; *Iscovitz v. Filderman*, 334 Pa. 585, 590, 6 A.2d 270 (1939). The following facts support the inference of fraud in this case: the taxpayer received a statutory notice of deficiency prior to the date of the indenture; his wife knew that he did not pay taxes and was generally familiar with his tax problems; and as she has continued to pay taxes herself she remains unpersuaded by the taxpayer's legal position on the payment of taxes. *See Klayman*, 736 F.Supp. at 649–50. Other factors relied on by this Court in *Klayman* in finding the conveyance fraudulent also

are present here: a close relationship between the transferor and the transferee; pendency of tax litigation against the taxpayer; the transferor's reservation of a benefit in the property; and the transferor's retention of possession. *Id.*

The existence of the Contract to Marry does not alter this analysis. As I found above, the document lacks credibility. The sole evidence that this Contract was executed on the date alleged, February 20, 1984, four days prior to the marriage, was the testimony of Mr. and Mrs. Purcell. The Contract was neither recorded nor referred to in the indenture, which was recorded after Mr. Purcell received the notice of deficiency, nor did any non-party witness the document.

In addition, the Purcells' testimony concerning the Contract to Marry was inconsistent. At trial, both testified that Mrs. Purcell's motive for entering the Contract was in part her anxiety about her husband's dangerous hobbies for which he could not obtain life insurance. Yet neither mentioned Mr. Purcell's hobbies when asked at their depositions about Mrs. Purcell's reasons for entering the Contract. In addition, I do not credit Mrs. Purcell's testimony that, having disregarded her husband's legal views on the taxation system, she then relied on Mr. Purcell rather than an attorney of her own to draft a document to protect her in the event of divorce from Mr. Purcell.

The conveyance of the Cricket Avenue property will be set aside as fraudulent against the United States as creditor pursuant to both 39 Pa.Stat.Ann. § 354 and 39 Pa.Stat.Ann. § 357, as the Purcells intended to defraud Mr. Purcell's creditors by conveying the property from the taxpayer to the taxpayer and his wife as tenants in the entireties. The United States is permitted to foreclose its tax liens against taxpayer against the Cricket Avenue property. The government has stipulated that the Commonwealth of Pennsylvania State Employee Retirement Fund has a previously recorded and superior lien against the Cricket Avenue property.

**B. Defendant John R. Gingras**

Taxpayer Mr. Purcell and defendant David Stevenson conveyed their interests in the Locust Avenue property to Gingras by indenture dated July 1, 1983 and delivered in October 1983, nearly two years before the first assessment by the government in August 1985. Gingras did not attempt to record the indenture until August 1, 1989, and did not record the deed until May 7, 1990.[4]

Once a tax assessment is made, a lien arises in favor of the United States "upon all property and rights to property whether real or personal, belonging to such person." 26 U.S.C. § 6321; 26 U.S.C. § 6322. The federal tax lien arises when an assessment of the tax is made. 26 U.S.C. § 6321; *United States v. National Bank of Commerce,* 472 U.S. 713, 719, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985); *Philadelphia & Reading Corp'n v. United States,* 944 F.2d 1063, 1064 n. 1 (3d Cir. 1991). A court must look to state law to determine whether a taxpayer has a property interest and to federal law to determine the priority of competing interests. *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) ("once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have repeatedly held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.'").

Defendant Gingras does not contest that the government lien attached to the Locust Avenue property. This is not clear, however. The first lien arose against the property of taxpayer Mr. Purcell in 1985, but Mr. Purcell had conveyed his interest in the Locust Avenue property to Gingras in 1983, nearly two years earlier. In decisions cited by the government, the tax liens arose either before the taxpayer acquired the property to which the liens attached or while the taxpayer held the property. *See U.S. v. Carson,* 741 F.Supp. 92, 94 (E.D.Pa.1990) (tax liens arose in 1984 and 1985; taxpayer acquired the property in 1986); *Burbano v. United States,* 723 F.Supp. 193, 194 (S.D.N.Y.1989) (tax lien arose on Feb. 27, 1987; taxpayer conveyed the property on March 25, 1987).

In a decision of this Court cited by the government, however, the Court found that the tax lien attached although it arose one year after the taxpayer had conveyed the property to a third party because the Court held the conveyance void under Pennsylvania law for failure to record. *See Raimo v. United States of America,* 61 A.F.T.R.2d 398, 1987 WL 28361, 1987 U.S.Dist. LEXIS 11705 (E.D.Pa. Dec. 21, 1987). The government relies also on *Prewitt v. United States,* 792 F.2d 1353, 1355 (5th Cir.1986), in which the Court of Appeals for the Fifth Circuit held that Texas law permitted the IRS lien to attach to property that the taxpayer's former wife had been awarded two months earlier pursuant to a divorce decree which was not recorded until after the IRS levy. *Prewitt,* 792 F.2d at 1355. The *Prewitt* holding has been criticized. *See Prewitt,* 792 F.2d at 1359 (transfer by unrecorded divorce decree meant "taxpayer had no interest or right whatsoever, legal or equitable, in this property") (special concurrence); *United States v. V & E Engineering & Constr. Co.,* 819 F.2d 331, 334 (1st Cir.1987); *Travis v. United States,* 1989 WL 362665, 1989 U.S.Dist. LEXIS 12047 (E.D.Tenn. Sept. 27, 1989). Nevertheless, I will consider the effect of Gingras' failure to record the conveyance on the government's interest in the property.

The government and Gingras do not agree on which of Pennsylvania's recording statutes applies here. The government contends that Gingras' interest is void against the government as a creditor of Mr. Purcell's pursuant to 21 Pa.Stat.Ann. § 444. Section 444 provides:

All deeds and conveyances ... shall be recorded in the office for the recording

---

**4.** Gingras admits that he did not record the indenture on the Locust Avenue property in part because he wanted to avoid the due-on-sale clause of the Main Line mortgage which Main Line could have invoked if it had known of the sale. Gingras' motivation for not recording the deed is not relevant to this case.

of deeds where such lands, tenements or herditaments are lying and being, within ninety days after the execution of such deeds or shall at any time after the passage of this act be made and executed in this commonwealth, and which shall not be proved and recorded as aforesaid, shall be judged fraudulent and void against any subsequent purchaser or mortgagee for a valid consideration, or any creditor of the grantor or bargainor in said deed of conveyance ...

21 Pa.Stat.Ann. § 444 (1775, March 18; 1893, May 19, P.L. 108, § 1).

Gingras claims that the applicable statute is 21 Pa.Stat.Ann. § 351. Section 351 provides, in relevant part:

All deeds, conveyances ... shall be recorded ... Every such deed ... which shall not be ... recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance ... shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which subsequent purchaser, mortgagee, or judgment creditor shall claim.

21 Pa.Stat.Ann. § 351 (1925, May 12, P.L. 613, § 1; 1931, June 12, P.L. 558, No. 191, § 1.)

Gingras claims that the government incorrectly relies on Section 444, which on its face protects creditors of the grantor, and that the applicable recording statute, Section 351, does not protect creditors.[5] The government concedes that, as a creditor Mr. Purcell's, it would not be protected by

Section 351. Post–Trial Memorandum of Plaintiff United States of America at 19 n. 6 ("The United States was a creditor of the conveyor—covered by Section 444—not a subsequent purchaser, mortgagee, or judgment creditor—covered by Section 351.")

Gingras contends that each recording act contains a notice exception. The government concedes that Section 351 expressly provides a notice exception, Government's Post–Trial Memorandum at 19, but argues that Section 444 protects creditors regardless of notice. *Id.* at 18–19. Contrary to the government's assertion, the Pennsylvania Supreme Court has found the notice exception to be implicit in Section 444. *Smith v. Miller,* 296 Pa. 340, 344, 145 A. 901 (1929) (claimant under unrecorded deed bears burden of showing subsequent purchaser had actual or legal notice of the prior right); *see Overly v. Hixson,* 169 Pa.Super. 187, 190, 82 A.2d 573 (1951) ("it was also the law under this statute, as it has been under all our recording Acts, that subsequent purchasers who had actual or constructive notice of unrecorded deeds were not protected.").

Gingras argues that whether Section 351 or Section 444 applies, the government had notice of Gingras' interest in the Locust Avenue property and therefore cannot claim the protection of either statute. I agree. I need not resolve the issue of which statute should apply because, as Gingras argues, the government had notice of the transfer of Mr. Purcell's interest in the Locust Avenue property to Gingras before the Internal Revenue Service assessed Mr. Purcell and filed its tax liens. The government therefore is disqualified from the protection of either Pennsylvania recording act.[6]

**5.** Gingras argues that Section 444 does not protect the government because it was repealed by the passage of the 1925 recording act, codified as Section 351, to the extent that it was inconsistent with the later recording act. Post–Trial Memorandum of Defendant John R. Gingras at 3–6; *see infra* n. 6.

**6.** Defendant Gingras claims that Section 444, enacted in 1775 and amended in 1893, was repealed by the subsequent passage of the recording act of 1925, as amended in 1931 and

1937 and codified as Section 351. The note following Section 444 confirms that it was repealed in part by a 1955 act regulating recording of instruments within the city of Philadelphia. However, the note to Section 444 explained that it was repealed only to the extent that it was inconsistent with the new provisions concerning Philadelphia. The note to Section 444 does not mention Section 351 as having repealed Section 444. The note following Section 351, however, explains that "the act of 1925

■ Under Pennsylvania law, either actual or constructive notice of a prior deed may defeat a subsequent claimant's interest. In *Long John Silver's, Inc. v. Fiore*, 255 Pa.Super. 183, 386 A.2d 569 (1978), the Pennsylvania Superior Court stated that at the time of signing an unconditional agreement for the sale of land the buyer acquires an equitable interest in the land, *see Byrne v. Kanig*, 231 Pa.Super 531, 332 A.2d 472 (1974), which can be defeated by a subsequent purchaser without notice of a prior transaction pursuant to the recording act:

> However, in order to qualify as a bona fide purchaser, the subsequent buyer must be without notice of the prior equitable estate. *Overly v. Hixson*, 169 Pa.Super. 187, 82 A.2d 573 (1951). If the subsequent purchaser had notice of the first agreement of sale or deed, he has no protection as a bona fide purchaser and his title is subject to the interest vested in the first purchaser. Either actual or constructive notice is sufficient to prevent the subsequent purchaser from acquiring the status of a bona fide purchaser. *Overly v. Hixson,* supra.
>
> Because constructive notice is not limited to instruments of record, a subsequent purchaser may be bound by constructive notice of a prior unrecorded agreement. *Overly v. Hixson, supra; Smith v. Miller*, 296 Pa. 340, 145 A. 901 (1929). This is true because the subsequent purchaser could have learned of facts that may affect his title by inquiry of persons in possession or others who the purchaser reasonably believes know such facts. *Lund v. Heinrich*, [410 Pa. 341, 189 A.2d 581 (1963)]; *Sidle v. Kaufman*, 345 Pa. 549, 29 A.2d 77 (1942).

*Long John Silver's*, 386 A.2d at 572–73. In that case, the Court held that the equitable interest conveyed by an agreement of sale which was not recorded was superior to the interests of two subsequent purchasers who had actual notice of the prior inter-

repealed all inconsistent acts or parts of acts." While the note following Section 351 does not mention Section 444 specifically, defendant Gingras relies on this language as support for his contention that the 1925 act repealed Section 444's protection of creditors.

The commentary of Title 21 of Purdon's Statutes, published in 1955, does not resolve the ambiguity as it refers to both recording acts, Sections 444 and 351, in explaining Pennsylvania law. Citing to both Sections, the commentary includes creditors as a protected class: "recording is obligatory, on peril of having an unrecorded deed adjudged fraudulent and void as against subsequent purchasers, mortgagees and *creditors of the grantor.*" 21 Pa.Stat.Ann. Commentary at 37 (emphasis added). The commentary explains that the later recording statute modified the existing recording statute to convert Pennsylvania to a "race-notice" system where the validity of deeds depends upon notice and the chronological priority of recording. *Id.* at 38.

In recent cases addressing the validity of recent unrecorded deeds, however, some courts have referred to a single Pennsylvania recording act, Section 351. *See Haggerty v. Erie County Tax Claim Bureau*, 107 Pa.Cmwlth. 265, 528 A.2d 681 (Pa.Cmwlth.1987), *app. den.*, 518 Pa. 645, 542 A.2d 1373 (1988); *Long John Silver's, Inc. v. Fiore*, 255 Pa.Super. 183, 386 A.2d 569 (1978); *McCannon v. Marston*, 679 F.2d 13, 15–16 (3d Cir.1982). Other courts dealing with recent deeds have referred to Section 444 in the past tense. *See Wheatcroft v. Albert*, 407 Pa. 97, 104, 180 A.2d 216 (1962) (in 1954, both recording statutes "were in effect"); *Overly v. Hixson*, 169 Pa.Super. 187, 190, 82 A.2d 573 (1951) (in deciding validity of a 1925 deed, referred to Section 444 as "applicable recording act" in past tense); *Commonwealth of Pa. v. Ulrich*, 129 Pa.Cmwlth. 376, 565 A.2d 859 (1989) (applying § 444 to chain of title originating with unrecorded conveyance in 1888).

At least one Pennsylvania court and two federal courts applying Pennsylvania law have held recently pursuant to Section 444 that creditors are protected from unrecorded conveyances. *See Busin v. Whiting*, 369 Pa.Super. 563, 535 A.2d 1078, 1081 (1987), *rev'd. on other grounds*, 524 Pa. 240, 570 A.2d 508 (1989) (pursuant to Section 444, "[a]n unrecorded deed is void against a subsequent purchaser for value or against a creditor."); *Raimo v. United States*, 61 A.F.T.R.2d 398, 1987 WL 28361, 1987 U.S.Dist. LEXIS 11705 (E.D.Pa. December 21, 1987) (pursuant to Sections 351 and 444, conveyance in 1983 held void against government as tax creditor for failure to record within ninety days) (relying solely on the statutory language); *United States v. Carson*, 741 F.Supp. 92, 95 (E.D.Pa. 1990) (alternate holding that pursuant to Sections 351 and 444, conveyance in 1986 void against government as tax creditor for failure to record within 90 days) (relying solely on *Raimo* ). With respect, it is not clear to this Court that the Courts in these cases should have applied Section 444 to recent conveyances or that Section 351 should have been interpreted to protect creditors and to require recording within 90 days.

est. *Id.* at 572. The Court held that the subsequent purchasers' actual knowledge of a prior interest in the property meant they "were on notice to inquire into the situation by contacting the [prior interest holder]" and therefore they were not protected by the recording act. *Id.* at 575. In addition, the Pennsylvania Supreme Court has held that "a fundamental rule in construing recording laws generally [is] that actual notice of an unrecorded instrument, if received by a subsequent lienor before his interest attaches, is equivalent to the constructive notice which recording provides." *In re 250 Bell Road*, 479 Pa. 222, 388 A.2d 297, 299–300 n. 1 (1978).

Government cites *Reiter v. Kille*, 143 F.Supp. 590 (E.D.Pa.1956) and *Prewitt*, 792 F.2d 1353 (5th Cir.1986) in support of its argument that it was entitled to rely on the recorded deeds and therefore had no notice of Gingras' interest. In *Prewitt*, the Court of Appeals for the Fifth Circuit, applying Texas law, held that oral notification of an IRS agent by the taxpayer's wife that she was "getting a divorce" was insufficient notice to the IRS of the transfer of interests where the divorce decree by which the wife took the property had not yet been filed. *Prewitt*, 792 F.2d at 1358–59. In *Reiter*, the Court held that a purchaser was not required to search tax sales records for a federal tax lien and therefore did not have constructive notice of the lien which arose against an intervening purchaser who did not record his deed. *Reiter*, 143 F.Supp. at 591–93.

Unlike the situations in *Prewitt* and *Reiter*, the lienholder, the IRS, is alleged itself to have received actual written notice in addition to oral notice to its agents of the transfer of the delinquent taxpayer's interest to Gingras before any tax assessments were made or tax liens filed against Mr. Purcell. In early 1982 or 1983 and again in early 1985, different IRS agents contacted Gingras pursuant to investigations of his interest in the property. The IRS admits that its agent had a copy of the Agreement of Sale from Mr. Purcell and Stevenson in March 1985 before it made any assessments or recorded any tax liens against Purcell's property. In addition, the part-nership, Gingras and Stevenson each filed timely 1983 tax returns documenting the transfer of Purcell's and Stevenson's interests in the property to Gingras. As a result of the 1985 investigation, Agent Whiting calculated an additional capital gain tax to be assessed against Purcell on the sale of his interest in the partnership, including the Locust Avenue property. IRS agent Whiting testified at trial that he and therefore the IRS had actual notice that Gingras' agreement with Purcell had been consummated. The above supports the view that the IRS had notice before the first IRS lien arose or was filed that after July 1, 1983, Gingras was the sole owner of the property.

The government argues that actual notice to one of its agents should not be imputed to the Internal Revenue Service as a whole. The government states: "information derived by the audit side of the Service, either by the filing of a tax return or communication with a single revenue agent, cannot be imputed automatically to the Collection Division of the IRS … the IRS is simply too large a governmental agency for such imputations of knowledge …" Government's Post–Trial Memorandum at 21.

There is precedent for imputing the knowledge of a revenue agent to the Internal Revenue Service. For example, in a decision of this Court, Chief Judge Luongo held in an admittedly different situation that the actual knowledge of a taxpayer's new address of one of its agents should be imputed to the Internal Revenue Service as a whole even if the taxpayer communicated with the agent verbally. *Wagner v. United States*, 473 F.Supp. 276, 279 (E.D.Pa. 1979) ("Of course, the Commissioner is bound by an address of which his agents acquire actual knowledge … as plaintiffs correctly argue, verbal communication of a change of address will suffice to charge the Commissioner with knowledge of that address."); *see Gibson v. United States*, 761 F.Supp. 685 (C.D.Cal.1991) ("knowledge of the IRS Service Center should be imputed to the Audit Division for the purpose of determining the taxpayer's last

known address"); *Trails End Motels, Inc. v. C.I.R.*, 532 F.Supp. 85, 88 (D.Kan.1982) ("there is ample authority to the effect that the IRS is bound by oral notification of an address change given to one of its agents") (citing *Alta Sierra Vista, Inc. v. Commissioner*, 62 T.C. 367, 375 (1974), *aff'd mem.* 538 F.2d 334 (9th Cir.1976)); *United States v. Eisenhardt*, 437 F.Supp. 247, 249–50 (D.Md.1977) (agent's knowledge of change of address imputable to the tax commissioner); *Cohen v. United States*, 297 F.2d 760, 773 (9th Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962)).

Other courts have held that "the IRS must be charged with the knowledge of its agents" in situations involving violations of bankruptcy stays. *In re Price*, 103 B.R. 989, 65 A.F.T.R.2d 90–359 (N.D.Ill.1989), *aff'd.* 130 B.R. 259 (N.D.Ill.1991) ("The size and complexity of the IRS does not excuse its disregard for the automatic stay."); *see In re Shafer*, 63 B.R. 194, 198 (D.Kan.1986) (IRS charged with knowledge of agents in Wichita and was responsible therefore for actions of agents in Utah); *In re Santa Rosa Truck Stop*, 74 B.R. 641, 643 (N.D.Fla.1987) ("IRS, at least through its agent, Mr. Jones, had knowledge of the [bankruptcy] filing").

There is precedent also for holding the IRS accountable for information submitted to it in tax returns. In support of its argument that the Service did not receive "notice of Gingras' ownership claim on the Locust Avenue property simply by Gingras filing an individual or partnership tax return or communicating information to an individual revenue agent concerned solely with determining taxpayer's tax liability, not which property he owns,"[7] Government's Post–Trial Memorandum at 20–21, the government cites *United States v. Zolla*, 724 F.2d 808 (9th Cir.1984), *cert. den.*, 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 59 (1984). The government's reliance on *Zolla* is misplaced. The Court of Appeals for the Ninth Circuit explained in a subsequent decision that the *Zolla* holding is consistent with prior Ninth Circuit holdings that the

IRS is to be held accountable for information reported in tax returns:

> *Zolla* holds that knowledge acquired in unrelated investigations is not necessarily imputed from one division to another. Tax returns, however, are a different matter; since *Welch v. Schweitzer* [106 F.2d 885 (9th Cir.1939)] we have consistently held that address information on subsequent returns is imputed to the IRS as a whole. *Zolla* confirms this ...

*King v. C.I.R.*, 857 F.2d 676, 680 (9th Cir. 1988).

*Zolla* supports defendant Gingras' contention that the IRS should be charged with knowledge of the information submitted by Gingras, the partnership and Stevenson on their respective 1983 returns. *See Cool Fuel Inc. v. Connell*, 685 F.2d 309, 312 (9th Cir.1982); *King*, 857 F.2d at 679; *Cyclone Drilling, Inc. v. Kelley*, 769 F.2d 662, 664 (10th Cir.1985) ("taxpayer's subsequent return bearing a new address provides the IRS with ... notice").

In this case, the IRS had notice of Gingras' unrecorded interest in the Locust Avenue property before the first lien arose or was filed against Mr. Purcell's property and the government therefore may not claim the protection of either Pennsylvania recording statute. *Smith*, 296 Pa. at 344, 145 A. 901; *Long John Silver's*, 386 A.2d at 575. Gingras' interest in the property therefore is superior to the government lien.

■ Except as provided in 26 U.S.C. § 6323, the federal rule of priority is first in time, first in right. *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). Congress excepted only four categories of interests from the standard rule.

> The lien imposed by section 6321 shall not be valid as against any purchaser, holders of security interests, mechanic's lienors or judgment lien creditor until notice thereof, ... has been filed by the Secretary.

---

7. Contrary to the government assertion, the IRS was concerned with what property Mr. Purcell owned as his tax liability depended in part on the sale of the partnership assets.

26 U.S.C. § 6323. If a claimant fits one of these four categories, its interest may prevail over that of the government, even though it is later in time than the government's lien unless the government has filed notice of its lien before the claimant's interest arose.

The government argues that whether the IRS had notice of Gingras' interest in the property is irrelevant because the federal statute governs the priority of competing claims and Gingras does not qualify for any of the statutory exceptions to the first in time rule. Government's Post–Trial Memorandum at 21–23. Defendant Gingras' claims that he qualifies as a "purchaser" under the federal statute. Post–Trial Memorandum of Defendant John R. Gingras at 16–17.

There is no need to reach the issue of whether Gingras qualifies for an exception to the first in time rule because Gingras' interest preceded the government lien and I have found as a matter of state law that his interest is valid against the government's interest. Gingras' interest was first in time because the tax lien arose after the taxpayer, Mr. Purcell, had deeded his share in the property to Gingras by a conveyance valid under Pennsylvania law. The cases relied on by the government therefore are inapposite. *See U.S. v. Carson*, 741 F.Supp. at 94; *Burbano*, 723 F.Supp. at 194; *Raimo*, 61 A.F.T.R.2d 398, 1987 WL 28361, 1987 U.S.Dist. LEXIS 11705.

## IV. *Conclusion*

For the foregoing reasons, I will enter judgment in favor of the United States of America on its claims against defendants Thomas W. Purcell and Constance M. Purcell. I will enter judgment in favor of defendants John R. Gingras, David M. Stevenson and Commonwealth of Pennsylvania State Employees Retirement System and defendant Main Line Federal Savings and Loan Association and against the United States.

## ORDER

AND NOW, this 30th day of September, 1991, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Judgment is ENTERED in favor of the United States of America and against defendant Thomas W. Purcell in the amount of $141,698.59 plus any interest that has accrued;

2. The conveyance of 211 Cricket Avenue, Ardmore, Pennsylvania from defendant Thomas W. Purcell to himself and defendant Constance Purcell is set aside as fraudulent, null and void pursuant to 39 Pa.Stat.Ann. §§ 354 and 357;

4. The tax liens of United States of America described in paragraphs 18–20 of plaintiff's Complaint are valid;

5. The Commonwealth of Pennsylvania State Employee Retirement Fund has a lien against the Cricket Avenue property which was previously recorded and is superior to that of the United States;

6. The tax liens on the real property known as 211 Cricket Avenue shall be foreclosed; the subject property shall be turned over to the marshall and sold and the proceeds from the sale shall be distributed in an amount sufficient to satisfy the lien of the Commonwealth of Pennsylvania State Employees Retirement System;

7. Judgment is ENTERED in favor of defendant Commonwealth of Pennsylvania State Employees Retirement System. In accordance with the stipulation between the United States of America and the Commonwealth of Pennsylvania State Employees Retirement System, the United States of American shall provide written notice of such sale to SERS at least twenty (20) days prior to such sale;

8. Judgment is ENTERED in favor of the United States of America and against defendant Constance M. Purcell;

9. Judgment is ENTERED in favor of defendant John R. Gingras and against the United States of America;

10. Judgment is ENTERED in favor of defendant David Stevenson and against the United States of America;

11. In accordance with the stipulation between the United States of America and defendant Main Line Federal Savings and Loan Association and the Order of this Court dated November 6, 1990, defendant Main Line's lien on 328 Locust Avenue is prior to and superior to any lien of the United States of America. Judgment is ENTERED favor of defendant Main Line Federal Savings and Loan Association and against the United States of America.

12. The Clerk shall MARK this case CLOSED for statistical purposes.